KAB

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Taheny,<br><br>      Plaintiff,<br><br>v.<br><br>David Shinn, et al.,<br><br>      Defendants. | No. CV-23-00194-PHX-JAT (ASB)<br><br>**ORDER** |

  Plaintiff John Taheny, who is currently confined in the Arizona State Prison Complex-Tucson, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants move for summary judgment. (Doc. 43.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 44), and he did not file a response.[1]

**I. Background**

  On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment claims against: (1) Defendants Buenacosa and Joshua in their individual capacities (Count One), (2) Defendant Centurion (Count Two), and (3) Defendant Shinn in his individual capacity and Defendant Thornell in his official capacity

---

[1] In Response to an Order to Show Cause, Plaintiff indicated that he intends to prosecute this action. (Doc. 46.) Plaintiff offered no cause, however, for extending the deadline to file a response to the motion for summary judgment and did not explain why he did not timely seek an extension of time to file a response.

(Count Three), and medical negligence claims against all Defendants (Count Four). (Doc. 6.)

Defendants move for summary judgment on all claims.

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.    Facts[2]

On July 29, 2021, Plaintiff fell while playing basketball and suffered pain and immobility of his left hand; he submitted a Health Needs Request (HNR) the same day. (Doc. 1 at 3.) On July 30, 2021, Plaintiff went to medical and saw Registered Nurse (RN) Wilson for a left-hand injury with bruising and swelling. (Doc. 41 ¶ 5.) She instructed Plaintiff to submit a HNR for a nurse to evaluate his hand and prescribed ice three times per day and over-the-counter ibuprofen. (*Id.*; Doc. 1 at 3.) On July 31, 2021, Plaintiff was seen by RN Buenacosa in response to a HNR stating that his hand is hurt and swollen. (Doc. 41 ¶ 6.) RN Buenacosa observed that Plaintiff was not in acute distress, had swelling to his left first digit extending to base of second, third, and fourth digits, with bruising to the left first digit, tender to touch. (Doc. 41 ¶ 7.) Plaintiff's color to his hand and capillary refills were within normal limits and his skin felt warm and dry to touch. (*Id.*) Plaintiff's hand was wrapped in an ace bandage, and he was instructed to continue with medical ice and ibuprofen; he was informed that a provider would be notified "as soon as available on yard." (*Id.*) RN Buenacosa told Plaintiff that he would order x-rays and that x-rays would be scheduled for August 4, 2021. (Doc. 1 at 3.)

On August 8, 2021, Plaintiff saw RN Buenacosa in response to an August 7, 2021, HNR in which Plaintiff stated that he was still in pain from his hand injury, his hand is very weak and tingling, and he needs more ibuprofen and x-rays. (Doc. 41 ¶ 9.) Plaintiff complained of unresolved pain and swelling with limited movement to his left second finger. (*Id.*) It was observed that Plaintiff had swelling in the left second finger, some weakness in the handgrip due to pain and had limited movement, but he had no discoloration, and his capillary refill was within normal limits. (*Id.*) Plaintiff appeared

---

[2] Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendants' supported facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence on the record. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.).

alert and in no acute distress. (*Id.*) Plaintiff's finger was placed in a buddy splint for his second digit, he was given more ibuprofen, and he was placed on the provider line. (*Id.*)

On August 10, 2021, Plaintiff saw NP Joshua for unresolved pain and swelling of his left hand, with it affecting his third finger and difficulty flexing his hand. (*Id.* ¶ 10.) Plaintiff stated that the swelling was slowly improving. (*Id.*) NP Joshua noted that Plaintiff was alert and oriented, and in no acute distress, that there was mild swelling of the left hand, with no redness or drainage, strength was three out of five, and Plaintiff was unable to fully flex his second finger. (*Id.*) NP Joshua submitted a STAT request for x-rays, recommended warm compression, and to continue with non-steroidal anti-inflammatory drugs. (*Id.*) Plaintiff's finger was wrapped to reduce swelling. (*Id.*)

Plaintiff submitted a HNR on August 13, 2021 asserting that this was his third HNR and still did not know what was going on with his hand. (*Id.* ¶ 11.) Plaintiff stated that he continued to experience swelling, difficulty moving his finger, and that an x-ray had not yet been taken. (*Id.*) On the same day, Plaintiff saw NP Joshua, at which time he also complained that the requested x-rays had not yet been taken. (*Id.* ¶ 12.) Plaintiff was instructed to wrap his band with ACE bandage and apply ice. (*Id.*) NP Joshua submitted a consultation request to send Plaintiff to the emergency room for swelling. (*Id.*)

The same day, Plaintiff was taken to Yuma Regional Medical Center for a left-hand injury, extreme swelling and numbness. (*Id.* ¶ 13.) Plaintiff was diagnosed with a closed displaced fracture of the second metacarpal bone, was placed in a volar splint, was prescribed Naproxen, and recommended to see Todd Runyan, an orthopedic specialist. (*Id.*)

On August 14, 2021, NP Curd reviewed the after-visit summary report from the hospital and submitted a consultation request for an offsite visit to orthopedic specialist, Dr. Runyan. (*Id.* ¶ 18.) On August 16, 2021, Plaintiff saw Physician Assistant (PA) Sidi for a follow up after his emergency room visit. (*Id.* ¶ 19.) PA Sidi recommended an urgent consultation with an orthopedic specialist, continued use of ibuprofen, and that Plaintiff should return to clinic if he had any worsening pain, swelling, erythema, warmth,

numbness, and tingling. (*Id.*)

On August 18, 2021, Plaintiff had a follow up visit with Dr. Runyan, and he recommended Plaintiff return for a subsequent follow up. (*Id.* ¶ 20.) Plaintiff was evaluated and diagnosed with a left hand closed fracture, and his left lower arm and hand were placed in a soft cast. (*Id.*) Plaintiff was able to move his fingers with no signs of impeding circulation noted. (*Id.*)

On August 19, 2021, onsite x-rays (taken on August 10, 2021) of Plaintiff's hand that showed an age-indeterminate fracture of the neck of the second metacarpal with mild displacement of the distal fragment. (*Id.* ¶ 21.) On August 20, 2021, Plaintiff was notified of the results and informed he would be scheduled for a follow up. (*Id.*) On August 23, 2021, per Dr. Runyan's request, Nurse Practitioner (NP) Curd created a consultation request for an offsite visit for a follow with his office. (*Id.* ¶ 22.)

On September 16, 2021, Plaintiff submitted a HNR, inquiring about the status of a follow up with a hand specialist, and was concerned that if the treatment plan set forth by the specialist was not followed, it would not go well for him. (*Id.*) Plaintiff was informed that the consultation was under review and, due to COVID, scheduling was still difficult. (*Id.*)

On October 18, 2021, Dr. Runyan saw Plaintiff and he did not require any additional follow up appointments with his office. (*Id.* ¶ 24.) On November 22, 2021, Plaintiff submitted a HNR complaining that after the removal of his cast, he was experiencing nagging pain, continued swelling and stiffness, and asserted he was exercising his hand. (*Id.* ¶ 25.) The same day, RN Buenacosa saw Plaintiff and Plaintiff reported that he had been doing exercises to get back to normal and that over-the-counter ibuprofen was not addressing his pain. (*Id.* ¶ 26.) Plaintiff was alert and in no acute distress and his left hand color and capillary refill were within normal limits. (*Id.*) It was noted that the bilateral handgrips were strong, but that the left handgrip was weaker due to pain. (*Id.*) Plaintiff was informed that his complaints would be forwarded to a provider for review. (*Id.*) NP Joshua reviewed this record on November 22, 2021. (Doc. 41-1 at 64.)

On December 10, 2021, Plaintiff submitted a HNR requesting a follow up because he continued to experience pain, stiffness, lack of mobility and strength in his hand. (*Id.* ¶ 27.) The next day, Plaintiff saw RN Buenacosa and Buenacosa continued ibuprofen and instructed Plaintiff to avoid strenuous activities. (*Id.* ¶ 28.)

On December 22, 2021, Nursing Director Carli Myers placed an order for x-rays of Plaintiff's left hand to compare to the August 2021 images; x-rays were taken on December 29, 2021 and the results appeared to be within normal limits. (*Id.* ¶ 31.) Plaintiff was encouraged to submit a HNR if he continued to experience pain. (*Id.*)

On February 3, 2022, Plaintiff submitted a HNR asking for the results of his x-rays and stated that he continues to experience pain, discomfort, and weakness in his hand. (*Id.* ¶ 32.) Plaintiff was seen on the nurses' line. (*Id.*) On February 4, 2022, Plaintiff saw RN Conley for complaints of continued hand pain, discomfort, and weakness. (*Id.* ¶ 33.) Plaintiff complained that he was not able to fully extend his left index finger and that his finger appeared shorter than his right and his hand grip was uneven as he could not close his left index finger; he was alerted that x-rays of the hand taken in December appeared normal, but the RN submitted a request so Plaintiff could see a provider and ibuprofen was continued. (*Id.*)

Plaintiff saw NP Peeks on February 8, 2022, and he complained of continued left-hand pain and weakness in pointer finger. (*Id.* ¶ 34.) An evaluation was performed, and it was noted that Plaintiff had decreased strength in his left pointer finger. (*Id.*) A consultation request was made for a referral to onsite physical therapy. (*Id.*) Plaintiff began physical therapy on February 15, 2022, and attended seven sessions. (*Id.* ¶ 35.)

On March 15, 2022, Plaintiff complained to PT Farley of left hand and wrist pain, with weakness, at which time PT Farley recommended Plaintiff use an ace bandage and gave him home exercises. (*Id.* ¶ 36.) On May 3, 2022, Plaintiff saw PT Farley for complaints for left wrist pain and secondary metacarpophalangeal (MCP) pain. (*Id.* ¶ 37.) PT Farley stated that Plaintiff would benefit from ice three times a day to address his left wrist pain. (*Id.*)

Plaintiff submitted a HNR on May 4, 2022, complaining of continued pain in his hand and wrist after participating in physical therapy. (*Id.* ¶ 38.) He complained that his hand was very weak and lacked strength and mobility. (*Id.*) Plaintiff was placed on the nurses' line. (*Id.*) That same day, Plaintiff saw RN Amaral and requested a steroid injection. (*Id.* ¶ 39.) RN Amaral noted that Plaintiff's left hand first knuckle appeared slightly depressed looking, with limited range of motion and pain complaints. (*Id.*) Plaintiff asserted that over-the-counter pain medications did not address his pain. (*Id.*) RN Amaral referred Plaintiff to the provider line for evaluation for a possible steroid injection. (*Id.*)

On May 9, 2022, Plaintiff saw PA Sidi for left hand and wrist concerns that he has been experiencing for the last 2-3 months. (*Id.* ¶ 40.) Plaintiff was referred to physical therapy and scheduled for a follow-up. (*Id.*) On May 10, 2022, Plaintiff saw PT Farley, who noted that Plaintiff showed progress, however, if Plaintiff showed continued minimal progress, then Farley would recommend another x-ray or seeing a hand therapist. (*Id.* ¶ 41.)

On June 2, 2022, Plaintiff saw PA Sidi for a follow-up regarding his pointer finger on his left hand and the MCP joint and wrist discomfort and complained that the home exercises from physical therapy have done little to help him. (*Id.* ¶ 42.) Sidi noted that Plaintiff's main concern is his ability to use his dexterity and performing his job after he is released from prison. (*Id.*) PA Sidi discussed risks of potential surgical intervention versus conservative management. (*Id.*) PA Sidi recommended consulting with physical therapy regarding the home exercises program. (*Id.*)

**IV.   Discussion**

Defendants assert that they are entitled to summary judgment because Plaintiff's providers were not deliberately indifferent to Plaintiff's serious medical needs, Plaintiff has not shown that he was subject to a constitutional deprivation due to a policy, practice, or custom of Centurion or Director Thornell, Plaintiff's claim for injunctive relief is moot, and there is no evidence that Defendants violated any standard of care.

### A.     Eighth Amendment

To prevail on an Eighth Amendment medical claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to this analysis: an objective prong and a subjective prong. First, as to the objective prong, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, as to the subjective prong, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To satisfy the knowledge component, the official must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need, *Jett*, 439 F.3d at 1096. But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted); *see Estelle*, 429 U.S. at 106 (negligence does not rise to the level of a constitutional violation). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105. Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096.

In this case, Plaintiff had a serious medical need. *See McGuckin*, 974 F.2d at 1059-60 (a serious medical need exists if there is an injury "that a reasonable doctor or patient would find important and worthy of comment or treatment"). The Court must therefore determine whether there is evidence that each Defendant was deliberately indifferent to Plaintiff's serious medical need. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (the inquiry into a defendant's liability for deliberate indifference "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."); *Rizzo v. Goode*, 423 U.S. 362, 370-71, 375-77 (1976).

### 1. Thornell

Defendant Thornell was substituted in his official capacity only to provide any prospective injunctive relief. Plaintiff, however, was released from ADC custody on December 27, 2024. Accordingly, Plaintiff's request for injunctive relief is moot, and Defendant Thornell must be dismissed from this action. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no

longer has a legally cognizable interest in a judicial decision on the merits of his claim.") *(*quoting *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012)).

### 2. Joshua

Defendants assert that Joshua was not deliberately indifferent to Plaintiff's serious medical needs. Defendant Joshua saw Plaintiff on two occasions, and on the first occasion, submitted an urgent request for x-rays, wrapped Plaintiff finger, recommended warm compression and to continue with anti-inflammatory drugs. On the second occasion, Joshua wrapped Plaintiff's hand and sent him to the hospital.

The evidence before the Court does not show that Joshua was deliberately indifferent to Plaintiff's serous medical needs. The evidence shows that Joshua treated Plaintiff and ordered urgent x-rays during their first encounter, and when Plaintiff returned to her, she immediately referred Plaintiff to the hospital. Nothing in these actions suggests that Joshua deliberately disregarded a serious risk to Plaintiff health. Accordingly, summary judgment will be granted in favor of Defendant Joshua.

### 3. Buenacosa

Defendant Buenacosa argues that he was not deliberately indifferent to Plaintiff's serious medical needs, but rather evaluated and treated Plaintiff conservatively and referred Plaintiff to a the "provider's line" each time Plaintiff saw Buenacosa on the nurse's line. Indeed, the evidence before the Court shows that Buenacosa was responsive to Plaintiff's complaints and Buenacosa put Plaintiff on the provider's line for further evaluation each time Buenacosa saw Plaintiff. Accordingly, on this record, there is no evidence that Buenacosa was deliberately indifferent to Plaintiff's serious medical needs and summary judgment will be granted in favor of Defendant Buenacosa.

### 4. Centurion and Shinn

To prevail on a claim against Centurion, as a private entity serving a traditional public function, Plaintiff must meet the test articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978). *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color

of state law). Likewise, to prevail on a claim against Shinn based on a policy, practice, or custom claim, Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694.

To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) Centurion and/or Shinn had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (internal quotation and citation omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

As discussed above, Plaintiff has not shown that he was deprived of his Eighth Amendment rights, and thus cannot show that such deprivation is attributable to a policy, practice or custom of Centurion or Shinn  Accordingly, summary judgment will be granted in favor of Centurion and Shinn.

**B.    Negligence**

Defendants assert that they are entitled to summary judgment on Plaintiff's negligence claim because Plaintiff has not produced any evidence or expert testimony of the standard of care or that Defendants breached the standard of care.

"'Medical malpractice action' or 'cause of action for medical malpractice' means an action for injury or death against a licensed health care provider . . ." Ariz. Rev. Stat. § 12-561.

> Both of the following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:

1. The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.

2. Such failure was a proximate cause of the injury.

Ariz. Rev. Stat. § 12-563. Unless medical malpractice is grossly apparent, the standard of care must be established by expert medical testimony. *Rasor v. Northwest Hosp.*, 403 P.3d 572 (Ariz. Ct. App. 2017); *Peacock v. Samaritan Health Svc.*, 765 P.2d 525 (Ariz. Ct. App. 1988).

Here, Plaintiff has not shown that medical malpractice is "grossly apparent" and Plaintiff has not designated any experts to support his medical malpractice claim against Defendants. Accordingly, summary judgment will be granted in favor of Defendants as to the medical malpractice claim.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 43).

(2) Defendants' Motion for Summary Judgment (Doc. 43) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 6th day of January, 2025.

James A. Teilborg
Senior United States District Judge